UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

FARON WILLIAMSON,
BARBARA ELAINE WILLIAMSON,
his wife, and
F.K.W., an infant who sues by and
through his Next Friend and Mother,
Barbara Elaine Williamson,

   Plaintiffs,

v.            Case No. 2:09-cv-00965

HEARTLAND PUBLICATIONS, LLC,

   Defendant.

## MEMORANDUM OPINION AND ORDER

  Pending before the court is the defendant's Motion for Summary Judgment (ECF No. 69). The parties previously consented to proceed before a magistrate judge (ECF No. 10, at 3), and the then-presiding District Judge designated the undersigned to conduct all further proceedings. (Order entered December 15, 2009, ECF No. 16.)

Background

  This is a deliberate intention action in which plaintiff Faron Williamson ("the plaintiff") seeks to recover damages from the defendant for injuries suffered on the job on April 13, 2007. He was injured while working as the Press Foreman for the defendant, at a newspaper printing facility in Williamson, West Virginia ("Daily News"). The plaintiff was injured when his right hand and forearm were caught between two printing press rollers that lacked any guards. The facts are presented in the light most favorable to the plaintiff.

The plaintiff's prior employment included approximately four years, from 1978 to 1982, as a "pressman" (non-supervisor) at the Logan Banner newspaper. (ECF No. 69-2, at 4, 6-7.) The Logan Banner and the Daily News are currently both owned by the defendant; the Logan Banner was not owned by the defendant when the plaintiff was employed there. The plaintiff's other prior employment was primarily devoted to auto mechanics. *Id.* at 5.

When the plaintiff began work at the Daily News, the printing press had not been used for months and the pressroom was "a mess." *Id.* at 15. He toured the pressroom with the then-Publisher, James Brown. *Id.* Mr. Brown told the plaintiff at some point that Mr. Brown knew nothing of the press. *Id.* at 16. The plaintiff explained that he wanted certain working conditions: employees in the pressroom were to have short hair and suitable clothing; access to the pressroom would be limited; the pressroom would be cleaned. *Id.*

The defendant owns approximately fifty newspapers at various locations in nine states, with its headquarters in Connecticut. (ECF No. 69-1, at 1.) A "Publisher" oversees the operations of each location and reports to the main office. *Id.* at 1-2. Each location has several departments; the supervisor of each department reports to the Publisher. *Id.* at 2. The Press Foreman reports to the Publisher. *Id.*

Two individuals, Noah May and "T.J.," worked in the pressroom prior to the plaintiff's employment. (ECF No. 69-2, at 17-18.) Within a month of the plaintiff's arrival, they were able to produce a paper. *Id.* at 18-19. The plaintiff took a copy of the paper to the Logan Banner pressroom to get their opinion of the print and its appearance. *Id.* at 18. While there, the plaintiff noticed that the Logan Banner's press was equipped with mesh gates covering the rollers. *Id.* He inquired about the mesh and

was told that "someone had got hurt and that they had to put those on for either OSHA reasons or insurance reasons, after that injury of that individual." *Id.* On an unknown date, during a conversation about adding a folder to the end of the pressline, the plaintiff mentioned to James Brown that mesh screen or netting should be added to cover the rollers. *Id.* at 18-19. The plaintiff thought that Brown was going to take care of the matter. *Id.* at 19. Within approximately a week of that conversation, the plaintiff noticed unfamiliar faces at the Daily News and Brown never returned, his employment having been terminated. *Id.* at 19-20. The next week, the plaintiff was injured. *Id.* at 35. The plaintiff had not mentioned adding the mesh guards to anyone else. *Id.*

When the plaintiff's hand and arm were drawn into the rollers, he was engaged in sprinkling water on a roller for the purpose of eliminating ink blotches and maintaining print quality. The plaintiff testified that "it wasn't uncommon for me to do that or it wasn't uncommon for any of them to have to do that. I mean, that's what we were taught, that's the way we always done it." *Id.* at 36-37. If there had been a mesh guard, the plaintiff believes that he would not have been caught in the rollers. *Id.* at 38.

The plaintiff filed this action in the Circuit Court of Mingo County, West Virginia, on April 13, 2009 (ECF No. 2-2.) Summonses were issued and then re-issued, with service of process accomplished on July 24, 2009 (ECF No. 1, at 1.) On August 24, 2009, the defendant removed the action to this court. *Id.* Proceedings were delayed for nine months while the defendant sought Chapter XI protection in Bankruptcy Court. (ECF Nos. 19-26.)

On May 31, 2012, the defendant moved for summary judgment arguing that "there is no actual evidence to prove that Heartland acted with 'deliberate intent' within the meaning of W. Va. Code § 23-4-2(d)(2)(ii)." (ECF No. 69.) The defendant's

3

memorandum contends that there is no "evidence that would tend to prove that Heartland had actual knowledge of a specific unsafe working condition and that Heartland intentionally exposed Mr. Williamson to a specific unsafe working condition as are required by the second and fourth elements of a deliberate intent cause of action." (ECF No. 70, at 1.) The plaintiffs filed a response in opposition (ECF No. 73), and the defendant filed a reply (ECF No. 75). With leave of court (ECF No. 79), the plaintiffs filed a surreply (ECF No. 87) and the defendant filed a response (ECF No. 89).

## Summary Judgment Standard of Review

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable factfinder could return a verdict for the non-movant. *Id.* The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. *Id.* at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## Deliberate Intention Claim

The West Virginia Workers' Compensation Act generally immunizes covered employers from employee suits for "damages at common law or by statute" resulting from work-related injuries. W. Va. Code § 23-2-6. This immunity is lost, however, if an employer acts with "deliberate intention." *Id.* § 23-4-2(d)(2). If the deliberate intent exception applies, the employee may file an action for damages in excess of workers' compensation benefits. *Id.* § 23-4-2(c).

The plaintiff is proceeding under § 23-4-2(d)(2)(ii), which requires proof of five elements:

> (A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;
> (B) That the employer, prior to the injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;
> (C) That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation or standard was

5

> specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;
> (D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C), inclusive, of this paragraph, the employer nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and
> (E) That the employee exposed suffered serious compensable injury or compensable death as defined in section one, article four, chapter twenty-three whether a claim for benefits under this chapter is filed or not as a direct and proximate result of the specific unsafe working condition.

W. Va. Code §§ 23-4-2(d)(2)(ii)(A)-(E).

The deliberate intention statute directs that "the court shall dismiss the action upon motion for summary judgment if it finds . . . that one or more of the facts required to be proved by the provisions of subparagraphs (A) through (E), inclusive, paragraph (ii) of this subdivision do not exist." *Id.* § 23-4-2(d)(2)(iii)(B). In *Mumaw v. U.S. Silica Co.*, 511 S.E.2d 117, 120 (W. Va. 1998) (*per curiam*),[1] the Supreme Court of Appeals of West Virginia ("SCAWV") wrote that "[o]ur prior cases construing [the deliberate intention statute] have always required the plaintiff to establish *each* of the statute's five factors." The court will address the second and fourth elements only, which are the only factors at issue.

### Actual Knowledge of an Unsafe Working Condition

The actual knowledge requirement "is not satisfied merely by evidence that the employer reasonably should have known of the specific unsafe working condition and of the strong probability of serious injury or death presented by that condition. Instead, it must be shown that the employer actually possessed such knowledge." Syl. Pt. 3,

---

[1] "[A] *per curiam* opinion involves application of settled law to facts necessarily different than those to which the law was previously applied . . . ." *Walker v. Doe*, 558 S.E.2d 290, 295 (W. Va. 2001). "While *per curiam* opinions differ from signed opinions based on the absence of new syllabus points, *per curiam* opinions nonetheless have precedential value as an application of settled principles of law to facts necessarily differing from those at issue in signed opinions. *Id.*

6

*Blevins v. Beckley Magnetite, Inc.*, 408 S.E.2d 385 (W. Va. 1991). "This is a high threshold that cannot be successfully met by speculation or conjecture." *Mumaw,* 511 S.E.2d at 123. Making the "actual knowledge" determination "requires an interpretation of the employer's state of mind, and must ordinarily be shown by circumstantial evidence, from which conflicting inferences may often reasonably be drawn." Syl. Pt. 2, *Nutter v. Owens-Illinois, Inc.*, 550 S.E.2d 398 (W. Va. 2001).

The defendant argues that the plaintiff, not Mr. Brown, had direct supervisory control over the print operations. (ECF No. 70, at 12.)

> As such, the conversation between Mr. Williamson and Mr. Brown in relation to guards, and the absence of any evidence that Mr. Brown conveyed this message to Heartland, fails to shed any light on whether Heartland had actual knowledge of employees placing their hands near unguarded rollers. * * * Mr. Williamson's brief conversation with respect to guards to Mr. Brown did not include any reference to the fact that Mr. Williamson routinely placed his hands on live rollers while the press was in operation. From this conversation, Heartland could not have known that employees were working in proximity to the unguarded rollers.

*Id.*

> Mr. Williamson did not inform Mr. Brown that unguarded rollers posed a high degree of risk or strong probability of serious bodily injury or death, nor is there any indication that Mr. Brown independently appreciated any potential risks given his lack of knowledge of press operations. [Williamson Depo., ECF No. 69-2, at 35.] The record is devoid of any indication that Heartland was aware of such a risk inasmuch as there is no evidence that Heartland knew of prior injuries or complaints, or was ever cited by any regulatory agency with respect to guarding. [Bush Depo, ECF No. 69-3, at 25-26.] Further, and as discussed above, there is nothing to suggest that even if Mr. Brown were aware of the risks that he conveyed this information to anyone else at Heartland.
>
> There is nothing to suggest that Heartland knew that the roll[er]s were unguarded, that Heartland knew of the risks associated with unguarded live rollers, or that Heartland was aware that Mr. Williamson had a practice of placing his hands near live rollers while the press was in operation. Plaintiffs cannot establish that Heartland had actual knowledge of a specific unsafe working condition that posed a high degree

7

>of risk and substantial likelihood of serious bodily injury. Accordingly, plaintiffs cannot meet their burden as to W. Va. Code 23-4-2(d)(2)(ii)(B).

*Id.* at 13.

The plaintiffs assert that under Syllabus Point 6 of *Ryan v. Clonch Industries, Inc.*, 639 S.E.2d 756 (W. Va. 2006), "if Plaintiffs can show Defendant violated a rule or regulation that imposed a mandatory duty upon an employer in the labor industry and specifically identifies a duty, then the Defendant cannot argue that it did not [have] actual knowledge of a specific unsafe working condition and of the high degree of risk of serious injury." (ECF No. 73, at 13.) They contend that they meet this burden in that the defendant violated 29 C.F.R. § 1910.212 and W. Va. Code §§ 21-3-2 and 21-3-4. The plaintiffs further argue that "at one point the printing press at issue contained guards over the in running nip-points where Plaintiff was ultimately injured," (*id.*, at 15), which is supported by the deposition testimony of Eric Eanes (ECF No. 73-4, at 21-24, 56-62). The sixteen guards were located in the press office. *Id.*, at 59.

The plaintiffs note that Faron Williamson was not provided with any training on the printing press. *Id.* They contend that "[t]he law is well settled in West Virginia that if an employer knows an employee lacks training but still allows him to perform the job and the employee is injured, then the employer had actual knowledge of the unsafe working condition." *Id.* at 16. The plaintiffs rely on *Coleman v. R.M. Logging, Inc.*, 700 S.E.2d 168 (W. Va. 2010) (*per curiam*), and *Skaggs v. Kroger Co.,* 788 F. Supp.2d 501 (S.D. W. Va. 2011), and argue that there is a genuine issue as to the material fact of whether the defendant knew that Mr. Williamson had insufficient training yet exposed him to the unsafe working condition.

In reply, the defendant asserts that *Ramey v. Contractor Enter., Inc.*, 693 S.E.2d 789 (W. Va. 2010) (*per curiam*), provides the controlling law. (ECF No. 75, at 2.) They claim that *Ramey* stands for the proposition that "management personnel with authority over the task being completed by the plaintiff must have actual knowledge of the specific unsafe working condition for deliberate intent liability to attach." *Id.* Heartland contends that "[n]o evidence exists indicating plaintiff advised Mr. Brown, or anyone else at Heartland, that the lack of guards posed a high degree of risk or strong probability of serious bodily injury or death." *Id.*

The defendant argues that the plaintiffs' reliance on *Ryan* is misplaced because the regulation and statutes cited by the plaintiffs do not create an affirmative duty on the employer to conduct a hazard assessment. *Id.* at 3.

With respect to Mr. Williamson's training, the defendant contends that the plaintiff made representations regarding his abilities and experience such that the defendant was not on notice of his alleged need for training. *Id.* at 5.

The plaintiffs were given leave to file a surreply for the purpose of addressing the *Ramey* decision. They contend that *Ramey* addresses the "intentional exposure" element of the statute, not the "actual knowledge" element. (ECF NO. 87, at 2.) They argue that *Coleman* and *Skaggs* held that the "actual knowledge" and "intentional exposure" elements are met when an employer requires an employee with no training to operate an unsafe piece of equipment. *Id.*, at 3. The plaintiffs raise, for the first time, an argument that the defendant should be subject to "judicial estoppel," citing *Riggs v. West Virginia University Hospital*, 656 S.E.2d 91 (W. Va. 2007). They contend that Heartland asserted that Mr. Williamson violated instructions not to add water to the

9

press when it was in operation, but now Heartland disclaims any knowledge of the unsafe practice. *Id.* at 5-6.

The defendant responded to the surreply, arguing that an alleged lack of training does not satisfy the "intentional exposure" element, again citing to *Ramey*. (ECF No. 89, at 1.) Heartland notes that the judicial estoppel argument exceeds the scope of the surreply, which was for the purpose of addressing *Ramey*. It asserts that its prior responses (to the effect that Mr. Williamson may have received work instructions) were made before discovery was completed and were never corroborated. *Id.* at 2-3.

The court will address each of the cases cited by the parties, as well as the evidence submitted by them.

In *Ryan*, the SCAWV held that an employer is prohibited from denying "actual knowledge" if it failed to perform a reasonable evaluation to identify hazards in the workplace in violation of a statute, rule or regulation imposing a mandatory duty to perform the same. This holding must be considered in relation to W. Va. Code § 23-4-2(c)(2)(ii)(C), which excludes those statutes, rules, regulations or standards generally requiring safe workplaces, equipment or working conditions. The plaintiffs point to 29 C.F.R. § 1910.212 and W. Va. Code §§ 21-3-2 and 21-3-4, as imposing mandatory duties. The federal regulation states that "[o]ne or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, . . . ." West Virginia Code § 21-3-2 provides that "[a]ll power-driven machinery . . . shall be so located, whenever possible, as not to be dangerous to employees, or, where possible shall be properly inclosed, fenced or otherwise protected." Section 21-3-4 prohibits anyone from removing or making ineffective any safeguard. Neither the federal regulation nor the

West Virginia Code imposes a mandatory duty on an employer to perform a reasonable evaluation to identify hazards in the workplace. In *Ryan*, the SCAWV considered a federal regulation, 29 C.F.R. § 1910.132(d)(1), which pertains to personal protective equipment. 639 S.E.2d at 762. The regulation requires the employer to conduct a "hazard assessment" to determine if hazards are present which necessitate the use of personal protective equipment. If such hazards are found, the employer must select and require the use of the personal protective equipment. Finally, the employer must verify that the assessment was performed. When 29 C.F.R. § 1910.212 and W. Va. Code §§ 21-3-2 and 21-3-4 are compared to 29 C.F.R. § 1910.132(d), their substantial differences are evident. The court concludes that 29 C.F.R. § 1910.212 and W. Va. Code §§ 21-3-2 and 21-3-4 are in the nature of statutes, rules and regulations which generally require safe workplaces and equipment, and do not impose mandatory duties to evaluate hazards in the workplace. The statutes and regulation at issue here basically require that dangerous parts of a machine, such as ingoing nip points, have guards. Thus *Ryan* is inapposite.

In *Coleman*, the SCAWV addressed the issue of training; that is, was there was a genuine issue as to the material fact regarding whether the logging employer had a subjective realization that the employee was not properly trained and, knowing his lack of training, nonetheless intentionally sent him out to cut trees. The evidence is uncontroverted in this case that Mr. Williamson was not provided any training, except for some on-the-job instruction by Eric Eanes. Mr. Williamson testified during his deposition that he told Mr. Bush that he had run the press at the Logan Banner, but he "had not ever run one that webbed up as that one [at the Daily News] did. And that, you know, I would like to look at the unit, the press and the unit and stuff, to determine for

11

myself what it will consist of and what all it would be for me to get familiar with, and to make sure what the situation was with it." (ECF No. 69-2, at 15. When asked if he needed any training, Mr. Williamson answered:

> A. They didn't offer anything like that. I mean, I've been familiar with what I knew from over here. You know, I just thought, you know, I'm the type of guy that, you know, I manage, you know what I mean.
> Q. When you took the job you kind of already knew how the press worked?
> A. I knew pretty much how it operated. I had never operated that type of press, but I knew by looking at it that similarities from what I knew from over here I took with me, you know, to be able to figure it out.

*Id.* at 22-23.

One of Mr. Williamson's predecessors as Press Foreman at the Daily News was Eric Eanes, who spent some time helping Williamson at the beginning of his employment. Eanes testified that "[f]rom my understanding, my working with Faron, he knew machinery well. He knew the press well. You know, however, a press is like a car, each one drives different, each one does this different so I was able to point out some things here and there to him." (ECF No. 73-4, at 35.) He estimated he worked with Mr. Williamson "four to five days a week just a couple hours a night for probably a month." *Id.,* at 42. He commented that "Faron had a wonderful grasp on everything. I don't think there was much I could have taught him. I was just, that's why it didn't take me long. I was just showing him where this was at on my machine. * * * He knew what he was talking about. I had no worries, fears that he would be capable to do the job." *Id.,* at 43. When asked about safety issues, Mr. Eanes testified that Mr. Williamson was capable in those regards and "very conscious of everything." *Id.*

Upon review of all the evidence, the court concludes that Mr. Williamson did not receive training on the operation of the Daily News press, but that he did not display any

need for such training. When Mr. Williamson toured the Daily News pressroom with Mr. Brown, it was Mr. Williamson who set forth the conditions he required for a safe and productive press operation. There is no evidence that anyone in Heartland's management had a subjective realization that Mr. Williamson was not properly trained and, knowing his lack of training, nonetheless intentionally directed him to operate the press. There is no evidence that Mr. Williamson asked for training or indicated that he was not capable of operating the press. Unlike the *Skaggs* case, Mr. Williamson had prior experience on a press.

In *Ramey*, the SCAWV distinguished its facts from those in *Ryan*, because there was evidence in *Ramey* that the employer carried out its inspection duties. 693 S.E.2d at 796. The undersigned has set forth above that Heartland did not have mandatory inspection duties with respect to the Daily News press. Thus actual knowledge cannot be imputed to Heartland based on a failure to conduct inspections.

The court has read and considered the arguments in the surreply and the response thereto and found them to be inapposite.

The court **FINDS** that the plaintiffs have failed to show that Heartland had actual knowledge of the existence of the specific unsafe working condition (unguarded rollers) and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition.

Intentional Exposure to the Unsafe Working Condition

In order to establish the intentional exposure element, there "must be some evidence [] that with conscious awareness of the unsafe working condition . . . an employee was directed to continue working in that same harmful environment." *Ramey*, 693 S.E.2d at 796 (quoting *Tolley v. ACF Indus., Inc.*, 575 S.E.2d 158, 168 (W.

13

Va. 2002). The only evidence regarding intentional exposure is Mr. Williamson's statement to Mr. Brown that the Logan press had guards and that guards would be a good idea. Mr. Brown thereafter did not return to the pressroom or the Daily News, and Mr. Williamson himself worked in the press office where the sixteen metal guards were stored. There is no evidence that any other individual in management had any knowledge that Mr. Williamson was exposed to unguarded rollers and that he purposefully put his hands in the vicinity of the rollers while they were in operation.

The court **FINDS** that the plaintiffs have failed to show that Heartland, with conscious awareness of the unguarded rollers, intentionally exposed Mr. Williamson to that unsafe working condition.

Based on the foregoing, it is apparent that the plaintiffs have failed to show that there is a genuine issue of material fact as to two of the elements of a deliberate intention cause of action and thus the defendant is entitled to judgment as a matter of law. It is hereby **ORDERED** that the defendant's Motion for Summary Judgment (ECF No. 69) is **GRANTED**.

The Clerk is directed to transmit this Memorandum Opinion and Order to counsel of record.

ENTER: August 6, 2012

Mary E. Stanley
United States Magistrate Judge